<u>NOT FOR PUBLICATION</u>

<u>UNITED STATES DISTRICT COURT</u>
<u>FOR THE DISTRICT OF NEW JERSEY</u>

—————————————————————
                                                        :
HERITAGE COMMUNITY BANK, A                               :
New Jersey Chartered Bank,                               :
                                                        :
                    Plaintiff,                          :          Civil Action No. 08-4322 (JAG)
                                                        :
                         v.                             :                   **OPINION**
                                                        :
HERITAGE BANK, N.A., proposed                           :
National Association to be engaged in the               :
 business of banking,                                   :
                                                        :
                    Defendant.                          :
—————————————————————:

<u>GREENAWAY, JR., U.S.D.J.</u>

      This matter comes before this Court on the motion of plaintiff, Heritage Community

Bank ("Plaintiff"), which seeks a preliminary injunction prohibiting defendant, Heritage Bank,

N.A. ("Defendant") from directly, or indirectly using the name "Heritage", "Heritage Bank,

N.A", or any similar name in commerce, and ordering Defendant to retract and impound all

labels, signs, stationery, brochures, marks, promotional and other written materials, bearing the

name "Heritage" or any variation of it in connection with the advertising, promotion, offering or

performance of banking or financial services or the production of related publications.  Upon

review of the submissions by the parties, this Court grants Plaintiff's motion for a preliminary

injunction on Count I of the Complaint against Defendant.[1]

—————————————

      [1] Plaintiff's Complaint states causes of action for–Infringement of Federally Registered
Service Mark, Lanham Act, 15 U.S.C. § 1114 (Count I); New Jersey Unfair Competition, N.J.

1

**I. Facts**

Plaintiff is a New Jersey chartered Bank that has been open for business since March 27, 2006.  (Kenny Decl. at ¶ 3.)  Plaintiff is the owner of a federal service mark and registration for the mark "Heritage Community Bank" for banking services, which Plaintiff has used throughout its organizational phase, and through its opening for business.[2]  (Id. at ¶ 5.)  The registration is

---

Stat. Ann. §56:4-2, et seq. (Count II); New Jersey Trademark Infringement, N.J. Stat. Ann. § 56:3-13.16 (Count III); Common law Trademark, Service Mark and Trade Name Infringement and Unfair Competition (Count IV).  Plaintiff is seeking injunctive relief only as to Count I.

[2] See Dranoff-Perlstein Associates v. Sklar, 967 F.2d 852, 855 (3d Cir. 1992). "Under the Lanham Act, service marks, which are used to identify the source of services, are entitled to the same legal protection as trademarks, which are used to identify the source of goods. 1 Jerome Gilson, Trademark Protection and Practice § 1.02[1][b], at 1-11 (1991). Although technically distinct, the terms are often used interchangeably, with no significant legal consequences. Trademark law recognizes four separate categories of marks, based on their levels of inherent distinctiveness. From most distinctive to least distinctive, these categories are: (1) arbitrary terms; (2) suggestive terms; (3) descriptive terms; and (4) generic terms. Although these categories are often separated by only the finest of lines, "the distinctions are crucial' for: If we hold a term arbitrary or suggestive, we treat it as distinctive, and it automatically qualifies for trademark protection at least in those geographic and product areas in which the senior user applies it to its goods. If we hold a mark descriptive, a claimant can still establish trademark rights, but only if it proves that consumers identify the term with the claimant, for that identification proves secondary meaning.... Finally, if we hold a designation generic, it is never protectable because even complete "success ... in securing public identification ... cannot deprive competing manufacturers of the product of the right to call an article by its name."

See also Lanham Act, 15 U.S.C.. § 1114(1), which provides, "Any person who shall, without the consent of the registrant--(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive, shall be liable in a civil action by the registrant for the remedies hereinafter provided. Under subsection (b) hereof, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or

valid and subsisting and remains in full force and effect.[3] (Id. at ¶ 6.)

Plaintiff offers a full range of banking services to the general public, including checking and savings accounts, and loans.  Plaintiff's primary focus is on loans, including commercial real estate lending, commercial loans, and small and medium business lending.  Plaintiff's checking, savings, and loan customers are located all over Northern New Jersey, and elsewhere.  (Kenny Decl. at ¶¶ 13, 15.)  Since its inception, Plaintiff has expended approximately five hundred thousand dollars in advertising and marketing throughout Northern New Jersey in order to brand the "Heritage" name under Heritage Community Bank.  (Plaintiff's Repl. Br. at ¶ 9.)  Plaintiff's marketing strategy has led the public to associate it with the name "Heritage".  (Id. at ¶¶ 26-30.)

At its inception, Defendant plans to open three New York City offices.  Defendant's business plan is to establish its brand "Heritage Bank, N.A." in New York before any expansion into any other region.  (Bagatelle Decl. at ¶ 7.)  Defendant's business will focus primarily on relationships for commercial or private banking as well as wealth management services to the owners, principals, and clients of its own commercial clients.  Defendant is headquartered in New York City, and has identified its primary trade area as New York, Kings, Nassau and western Suffolk counties in New York State.  (Id. at ¶ 6.)  Defendant has identified several locations in the New York City Metropolitan area, including a location in Essex County, New Jersey where it is planning to do business with clients who may live or work in New Jersey. Defendant has already secured an option on office space in Essex County, New Jersey.  (Id. at ¶¶

to deceive."

[3] Plaintiff is the owner of the service mark registration for "Heritage Community Bank" for banking services, with Registration No. 3,288,121, which was registered on September 4, 2007. (Compl. at ¶ 16.)

7-8.)  Defendant has negotiated arrangements with two relationship managers from New Jersey,

who have existing clients in New Jersey.  These same relationship managers likely would move

to Defendant's proposed offices in Roseland, New Jersey.  (Def. Supp. Mem. at 13.)

In May 2008, Plaintiff became aware that Defendant intended to establish a directly

competing bank in the same target market and overlapping geographic region using a similar

name, "Heritage Bank, N.A.".  (Id. at ¶¶ 31-32.)  Upon learning of Defendant's plans, Plaintiff's

counsel sent Defendant's counsel a cease and desist letter. (Cagney Decl. at Exhibit C.)

Negotiations followed but no compromise was reached.  Defendant opened for business as

Heritage Bank, N.A. on November 24, 2008, the date of this Court's hearing.  (Tr. 25:20-25:23,

November 24, 2008.)

## II.  Legal Standard – Preliminary Injunction

"[T]he grant of injunctive relief is an 'extraordinary remedy, which should be granted

only in limited circumstances.'"  Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797,

800 (3d Cir. 1989) (citing Frank's GMC Truck Ctr. Inc. v. Gen. Motors Corp., 847 F.2d 100, 102

(3d Cir. 1988)).  Generally, in determining whether to grant a preliminary injunction or a

temporary restraining order, courts consider four factors:

> (1) the likelihood that the applicant will prevail on the merits at final hearing; (2)
> the extent to which the plaintiffs are being irreparably harmed by the conduct
> complained of; (3) the extent to which the defendants will suffer irreparable harm
> if the preliminary injunction is issued; and (4) the public interest.

S & R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 374 (3d Cir. 1992) (citing Hoxworth v.

Blinder, Robinson & Co., 903 F.2d 186, 197-98 (3d Cir. 1990)).  "[W]hile the burden rests upon

the moving party to make [the first] two requisite showings, the district court" should look to

4

factors three and four when relevant.  Acierno v. New Castle County, 40 F.3d 645, 653 (3d Cir. 1994).  "All four factors should favor preliminary relief before the injunction will issue."  S & R Corp., 968 F.2d at 374 (citing Hoxworth, 903 F.2d at 192).

In order to prove irreparable harm, the moving party must "demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial."  Acierno, 40 F.3d at 653 (quoting Instant Air Freight Co., 882 F.2d at 801).  "Economic loss does not constitute irreparable harm."  Acierno, 40 F.3d at 653.  "[T]he injury created by a failure to issue the requested injunction must "'be of a peculiar nature, so that compensation in money cannot atone for it.'"  The word irreparable connotes "'that which cannot be repaired, retrieved, put down again [or] atoned for.'""  Id. (internal citations omitted).  In addition, the claimed injury cannot merely be possible, speculative or remote.  Id. at 655.  "More than a risk of irreparable harm must be demonstrated.  The requisite for injunctive relief has been characterized as a 'clear showing of immediate irreparable injury,' or a 'presently existing actual threat; an injunction may not be used simply to eliminate a possibility of a remote future injury.'"  Id. (quoting Cont'l Group, Inc. v. Amoco Chems. Corp., 614 F.2d 351, 358 (3d Cir. 1980)).

**A.  Likelihood of success on the merits**

To prove trademark infringement or unfair competition under the Lanham Act, "a plaintiff must demonstrate that (1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion."  A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 210 (3d Cir. 2000).  "A likelihood of confusion exists when 'consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different

5

product or service identified by a similar mark.'" Id. at 211 (quoting Sklar, 967 F.2d at 862 (3d Cir. 1992)).

In determining whether likelihood of confusion exists, regardless of whether the goods or services directly compete, the Third Circuit has set forth a test, which includes consideration of the following factors:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark;
> (2) the strength of the owner's mark;
> (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;
> (4) the length of time the defendant has used the mark without evidence of actual confusion arising;
> (5) the intent of the defendant in adopting the mark;
> (6) the evidence of actual confusion;
> (7) whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media;
> (8) the extent to which the targets of the parties' sales efforts are the same;
> (9) the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors; [and]
> (10) other facts suggesting that the consuming public might expect the prior owner to manufacture both products, or expect the prior owner to manufacture a product in the defendant's market, or expect that the prior owner is likely to expand into the defendant's market.

Id. at 215 (citing Interpace Corp. v. Lapp, Inc., 721 F.2d 460 (3d Cir. 1983)).

The Third Circuit noted that "the Lapp test is a qualitative inquiry. Not all factors will be relevant in all cases; further, the different factors may properly be accorded different weights depending on the particular factual setting. A district court should utilize the factors that seem appropriate to a given situation." Id. With that caveat in mind, this Court turns to the ten factors.

**Factor 1: Similarity of the marks**

"'The single most important factor in determining likelihood of confusion is mark

6

similarity.'" <u>A&H</u>, 237 F.3d at 216 (quoting <u>Fisons Horticulture v. Vigoro Indus.</u>, 30 F.3d 466, 476 (3d Cir. 1994)).  "Marks 'are confusingly similar if ordinary consumers would likely conclude that [the two products] share a common source, affiliation, connection or sponsorship.'" <u>Id.</u> (quoting <u>Banff, Ltd. v. Federated Dep't Stores, Inc.</u>, 841 F.2d 486, 492 (2d Cir. 1988)).  "Side-by-side comparison of the two marks is not the proper method for analysis when the products are not usually sold in such a fashion.  Instead, an effort must be made to move into the mind of the roving consumer."  <u>Id.</u>  That is, the court should look at the sight, sound, and meaning of the marks to determine their similarity.  <u>Id.</u>  Of course, "[w]hen the dominant portions of the two marks are the same, confusion is likely."  <u>Country Floors, Inc. v. P'ship of Gepner and Ford</u>, 930 F.2d 1056, 1065 (3d Cir. 1999).  "While some cases indicate that the first word, prefix or syllable in a mark is always the dominant part, it is impossible to make any generalized statement as to whether the beginning or end of a mark is more important when one or the other is used by another seller."  4 J. Thomas McCarthy, McCarthy on Trademarks § 23:45 (2008) (footnotes omitted).

The Third Circuit has recognized that "the proper legal test is not whether there is some confusing similarity between sub-parts of the marks; the overarching question is whether the marks, '*viewed in their entirety*,' are confusingly similar."  <u>Kos Pharm., Inc. v. Andrx Corp.</u>, 369 F.3d 700, 713 (3d Cir. 2004) (quoting <u>A&H</u>, 237 F.3d at 216) (emphasis in original).  <u>See also</u> <u>In re Hearst Corp.</u>, 982 F.2d 493, 494 (Fed. Cir. 1992) ("Marks tend to be perceived in their entireties, and all components thereof must be given appropriate weight.  The appearance, sight, and commercial impression of VARGA GIRL derive significant contribution from the component 'girl'. . . .  When GIRL is given fair weight, along with VARGA, confusion with

VARGAS becomes less likely." (internal citations omitted)).

Plaintiff and Defendant both concede that the dominant portion of their respective marks is the word "Heritage." (Plaintiff's Repl. Br. at 5, Def. Mem. at 6.)  Defendant argues that while an identical dominant term such as "Heritage" may appear to suggest similarity, it is "the differences in the marks as a whole that are critical to the analysis here." (Def. Mem. at 6.)

It is this Court's view that the dominant portion of both marks is the word "Heritage" and the difference between the two marks, "Community" in the Plaintiff's mark, and "N.A." in the Defendant's mark are not significant.  Further, this Court believes that neither consumers nor commercial banking customers are likely to appreciate the distinction Defendant attempts to draw.  Since the word "Bank" appears in both Plaintiff's and Defendant's names, and both are in the business of banking in overlapping markets, this Court finds that the use of one additional term, in this case, "Community" as opposed to "N.A.", barely reduces the potential for confusion between the two marks.  This is particularly true since it is common in business practice for commercial bank names to be shortened to one word such as "Citi" for Citibank, or "Chase" for J.P. Morgan Chase & Co., or "WaMu" for Washington Mutual.  Indeed this Court is hard pressed not to find the two marks strikingly similar.

In addition, Plaintiff has discovered that Defendant refers to itself by the shortened, "Heritage" when calls are placed to its office telephone, which further contributes to the potential for confusion.  (Cagney Decl. at ¶ 13.)

This Court concludes that ordinary customers would likely conclude that the two marks share common source, affiliation or connection.  A&H, 237 F.3d at 216.

This Court also notes that the Third Circuit has looked favorably on the inclusion of

disclaimers as a method of distinguishing between trademarks. A&H, 237 F.3d at 219 ("[T]he District Court committed no factual error in concluding that Victoria's Secret's disclaimer helped to dispel potential consumer confusion between the Miraclesuit and The Miracle Bra swimwear."). Defendant, this Court has learned, is not using a disclaimer that had been originally proposed and has no intention of using one.[4]

Based on these facts, this Court finds that Plaintiff's and Defendant's marks when viewed in their entirety are confusingly similar. A&H, 237 F.3d at 216. See also Winchester Federal Sav. Bank, et al.v. The Winchester Bank, Inc., 359 F. Supp. 2d 561 (E.D. Ky. 2004).[5] This factor weighs in favor of the Plaintiff.

### Factor 2: Strength of mark

"Distinctiveness on the scale of trademarks is one measure of a mark's strength [while] [c]ommercial strength, or marketplace recognition of the mark, is another." Fisons, 30 F.3d at 479 (internal citations omitted). "The first prong of this test looks to the inherent features of the mark; the second looks to factual evidence of 'marketplace recognition.'" A&H, 237 F.3d at 221 (citing Fisons, 30 F.3d at 479).

---

[4] At oral argument Defense Counsel stated in response to a question from the Court about the disclaimer, "Absolutely, that was something that was taken off the table." (Tr. 3:18-3:22, 40:4-40:9, November 24, 2008.) See also Bagatelle Decl. at ¶ 14: "Therefore, we do not intend to use the disclaimer in the future."

[5] In Winchester, the Court granted summary judgment in favor of plaintiffs on their trademark infringement claim. Concerning the issue of similarity between the marks, the Court explained, "Here, the parties' marks bear great similarity to each other, which increases the likelihood of confusion.... Even if the plaintiffs typically use additional words in conjunction with the word "Winchester" when promoting WFSB's name, the predominant feature of the name is WINCHESTER. Since the word is also the predominant feature of the defendant's name, the likelihood of confusion is high." The Court also found that both banks offered similar banking services, and were to operate in the same geographic area. 359 F. Supp. 2d at 569.

<u>First part of test – distinctiveness or conceptual strength</u>

In determining if a mark is protectable, there are four classifications of marks: generic, descriptive, suggestive, and arbitrary or fanciful.  Generic marks are not protectable.  However, "[t]he classification of a mark as arbitrary, suggestive, or descriptive is only secondarily used to determine the degree of protection a mark should receive once protectability has been established."  <u>A&H</u>, 237 F.3d at 222.  "Although the wide use of a term within the market at issue is more probative than the wide use of a term in other markets, the extensive use of the term in other markets may also have a weakening effect on the strength of the mark."  <u>Id.</u> (citing <u>Fisons</u>, 30 F.3d at 479).  "The relevance of such other uses of similar marks is apparent; if a consumer is aware that a particular mark . . . is often used to designate a variety of products made by a variety of manufacturers, that consumer will be less likely to assume that in a particular case, two individual products, both with the [same] mark . . ., come from the same source."  <u>Id.</u> (citing <u>Steve's Ice Cream v. Steve's Famous Hot Dogs</u>, 3 U.S.P.Q.2d 1477, 1479 (T.T.A.B. 1987) ("[T]he numerous third-party uses [of Steve's] demonstrate that the purchasing public has become conditioned to recognize that many businesses  . . . use the term . . . and . . . is able to distinguish between these businesses based on small distinctions among the marks.") and <u>S.C. Johnson & Son, Inc. v. Johnson</u>, 116 F.2d 427, 430 (2d Cir. 1940) ("When all is said, if a man allows the good will of his business to become identified with a surname so common as Johnson, it is fair to impose upon him some of the risk that another Johnson may wish to sell goods not very far afield.")).

Plaintiff argues that its mark is arbitrary or fanciful and therefore entitled to protection. (Plaintiff's Repl. Br. at 9.)  Arbitrary or fanciful marks use terms that neither describe nor

suggest anything about the product; they "bear no logical or suggestive relation to the actual characteristics of the goods." A&H, 237 F.3d at 221 (citing A.J. Canfield, 808 F.2d at 296). Defendant cites to American Heritage Life Ins. Co. v. Heritage Life Ins. Co., 494 F.2d 3 (5th Cir. 1974), in which the Fifth Circuit found "Heritage" to be descriptive for life insurance companies because life insurance companies are in the business of providing "heritages." In the context of the banking industry, this Court does not find the term "Heritage" to be a descriptive, suggestive, or generic term but rather arbitrary because there is no logical or suggestive connection between the term "Heritage" and the banking services provided.

This Court does not find the term "Heritage" to be even suggestive regarding the specific characteristics of the service provider, which might be significant to an understanding of the services rendered by a business such as a bank, which mostly offers services rather than tangible goods.  Heritage Community Bank  has only been in existence itself for a little more than two years, which tends to support Plaintiff's argument that its chosen name is arbitrary.  A&H, 237 F.3d at 221.  For purposes of evaluating the merits of the request for a preliminary injunction, this Court will accept Plaintiff's categorization of the mark as arbitrary or fanciful. There is no relation this Court can find between the name "Heritage" and the actual characteristics of the goods and services offered by the Plaintiff, namely banking services.

"The Court believes that whatever category of distinctiveness into which the mark falls, the multiple uses of [a particular word] in other markets is relevant to a determination of [plaintiff's] mark's strength." A&H, 237 F.3d at 224.  In A&H, Judge Becker looked at whether the mark is present or ubiquitous in other markets.  In the instant case, Defendant argues that multiple third party uses of the dominant portion of the Plaintiff's mark "Heritage" weakens the

mark.  "Heritage is a weak mark among many in the crowded banking and financial services industry." (Def. Mem. at 8.)

Defendant points to Sun Banks of Florida, Inc v. Sun Federal Savings and Loan Association, 651 F.2d 311 (5th Cir. 1981) to support this proposition.  In Sun Banks, the Fifth Circuit determined that a trademark is weakened by widespread use of the mark. Id. at 316. Specifically, the Circuit reversed the district court which had found that defendant Sun Banks Federal Savings and Loan Association had violated Sun Federal Savings' trademark because of its use of the term "Sun."  The evidence showed that there was "an impressive array of third-party single and multi-word use of the Sun mark."  There were 4400 businesses registered with the Florida Secretary of State that used the word Sun in their names during the relevant time period of the case. Id. at 316.  Most important, twenty-five of those businesses were active financial businesses using the word "Sun" and fifty financial businesses were using a compound of the word "Sun." Id. at n.8.

The facts in this case are vastly different.  Here, there are only five instances of banks using the term "Heritage" in their service mark nationwide, and no banks using this mark in the New Jersey region." (Plaintiff's Repl. Br. at 9; Tr. 2:21-2:25.) This stands in severe contrast to the twenty-five financial institutions in the State of Florida using some iteration of the term "Sun".  "Heritage Community Bank"–Plaintiff's mark is unique in this market.[6]

---

[6] Defendant also cites First National Bank, In Sioux Falls v. First National Bank, South Dakota, 153 F.3d 885 (8th Cir. 1998) to support its contention that at least one court has found that when two banks have a name that begins with identical terms, but have different words in their respective marks, that the likelihood of confusion is not significant enough to deny both banks to operate in the same market. (Tr. 12:16-12:22.)  Defendant has acknowledged that the dominant term in both Plaintiff's and Defendant's mark is "Heritage", whereas in First National, the Eighth Circuit upheld the portion of the district court's decision in which district court found

<u>Second part of test – marketplace recognition</u>

Plaintiff has advertised extensively over the two year period since its inception, spending nearly $500,000 to expand its business rapidly. (Plaintiff's Repl. Br. at 9.) Plaintiff advertises every week in the 3 local papers and normally advertises in the Sunday Daily Record of Morristown, New Jersey, and the Sunday Star Ledger. Plaintiff has also used both radio and television for advertising. Plaintiff has broadcast radio advertisements on WMTR (1250 on the AM dial) and WDHA (105.5 on the FM dial), which are both broadcast out of Morristown. Plaintiff has also broadcast television commercials on Cablevision in its "Morris Zone." (Kenny Decl. at ¶ 19.)

In addition, Plaintiff has placed billboards on roads and highways in Dover, Netcong, Roxbury Township, Morristown, Kenvil, and Randolph, New Jersey, and has also placed advertising posters at train stations in Dover, Morris Plains, and Denville, New Jersey. (<u>Id.</u> at ¶ 20.) Prior to Plaintiff's grand opening in 2006, it sent 13,400 direct mail pieces, and sent out an additional 60,000 direct mail pieces to promote its rewards checking program. Plaintiff is in the process of finalizing plans to open a new branch in Denville for which it plans a direct mail drop of 13,500 pieces. (<u>Id.</u> at ¶ 21.) This Court finds this to be strong evidence to consider regarding the commercial strength of Plaintiff's mark. <u>See</u> <u>A&H</u> 237 F.3d at 224 (Advertising expenditures are "clearly relevant" to a commercial strength inquiry).

---

that the use of defendant's full name reduced the likelihood of confusion. Further, in <u>First National</u>, the district court considered the logos of both banks and determined that even though their names were similar, the logos were different enough that confusion was unlikely. The service marks of the banks are at issue in this case, rather than the logos of the respective banks. In addition, the district court found that when the two banks used the same abbreviated name, "First National" confusion was more likely to occur, and in those instances, the defendant was disallowed from using the <u>First National</u> mark. <u>Id.</u> at 889-90.

13

This Court finds that this factor weighs in favor of Plaintiff.

**Factor 3: Care and attention expected of consumers**

"The third <u>Lapp</u> factor focuses on 'the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase.' 'The following non-exhaustive considerations should guide a court's determination of the standard of ordinary care for a particular product. Inexpensive goods require consumers to exercise less care in their selection than expensive ones. The more important the use of a product, the more care that must be exercised in its selection. In addition, the degree of caution used depends on the relevant buying class. That is, some buyer classes, for example, professional buyers will be held to a higher standard of care than others. Where the buyer class consists of both professional buyers and consumers, the standard of care to be exercised by the reasonably prudent purchaser will be equal to that of the least sophisticated consumer in the class.'" <u>McNeil Nutritionals, LLC v. Heartland Sweeters, LLC</u>, 511 F.3d 350, 363-64 (3d Cir. 2007) (citing <u>Lapp</u>, 721 F.2d 463 and <u>Versa Prods. Co. v. Bifold Co.</u>, 50 F.3d 189, 204-05 (3d Cir. 1995) (internal quotation marks, ellipses, and citation omitted)).

Both Plaintiff and Defendant will offer both consumer banking and commercial banking services which entails retail consumer checking and savings accounts with a focus on commercial lending. (Tr. 32:3-34:19, November 24, 2008; Plaintiff's Br. at 12). Under the aforementioned test, the degree of care exercised by the ordinary consumer of retail banking services would control. <u>Heartland Sweeteners</u>, LLC, 511 F.3d at 363-64. Consumers of both banks, therefore, would be expected to exercise the care of a routine banking customer in making decisions about banking services, which is more limited than what might be expected of

14

sophisticated banking customers or financial service professionals.   Plaintiff has already

demonstrated examples of actual confusion between its mark and Defendent's mark, including by

financial service professionals, so while defendant argues that banking customers use extra care

in selecting banking products, this Court finds that there is potential for confusion in the future.

(Kenny Decl. at ¶ 43.)(See infra Factor 6 regarding actual confusion.)  This factor weighs in

Plaintiff's favor.

> **Factor 4: Length of time defendant has used the mark**

"When parties have used similar marks for a sufficient period of time without evidence of

consumer confusion about the source of the products, there is an inference that future consumers

will not be confused either."  Fisons, 30 F.3d at 476 (citing Scott Paper Co. v. Scott's Liquid

Gold, Inc., 589 F.2d 1225, 1230 (3d Cir. 1978) (finding no likelihood of confusion in part

because "defendant's mark had been utilized . . . for over forty years without any evidence of

actual confusion.")).

Defendant's bank opened on November 24, 2008.  (Tr. 25:20-25:23, November 24,

2008.)  As such, there has not been enough time during which both marks were used to be able

to apply this factor, although their have been several instances of actual confusion during

Defendant's organizational period, which clearly inures to Plaintiff's benefit.  (See infra Factor 6

regarding actual confusion.)  More important, Defendant has no ability to argue that its sustained

presence in the market undercuts Plaintiff's claim.  This factor weighs in Plaintiff's favor.

**Factor 5: Intent of defendant**

"Intent is relevant to the extent that it bears on the likelihood of confusion. . . .

[D]efendant's intent will indicate a likelihood of confusion only if an intent to *confuse* consumers

is demonstrated via purposeful manipulation of the junior mark to resemble the senior's." A&H, 237 F.3d at 225-26 (emphasis in original).

Defendant maintains that it had, and still has, no intent to infringe Plaintiff's trademark rights and that it selected the term "Heritage" as part of its mark for its description of family, experience, legacy, and quality that the name implies. (Def. Mem. at 15.)  Defendant also maintains that it commissioned a full trademark search for the "Heritage" name and found multiple instances in which the name was used and therefore concluded that widespread use of the term prevented any single business from claiming any rights to the name. (Bagatelle Decl. at ¶ 5.)  Defendant further notes that it used a disclaimer after receiving Plaintiff's cease and desist letter in May 2008, while the two parties negotiated to avoid any risk. (Def. Mem. at 15.)

This Court finds, however, that Defendant's refusal to continue using a disclaimer (a very recent development) and its efforts to open for business more expeditiously than originally represented, despite the pendency of a preliminary injunction hearing, suggests intent on the part of the Defendant. (Tr. 3:18-3:20; 40:2-40:17.)  Accordingly, this Court finds that this factor weighs in favor of Plaintiff.

**Factor 6: Evidence of actual confusion**

"Evidence of actual confusion is not required to prove likelihood of confusion." Checkpoint, 269 F.3d at 291 (citing Versa Prods., 50 F.3d at 205; Fisons, 30 F.3d at 476 ("[W]hile evidence of actual confusion would strengthen plaintiff's case, it is not essential.")). See also Optician's Ass'n of America v. Indep. Opticians of America, 920 F.2d 187, 195 (3d Cir. 1990) ("Proof of actual confusion is not necessary; likelihood is all that need be shown.").

The Third Circuit has "recognized that it is difficult to find evidence of actual confusion

16

because many instances are unreported.  For this reason, evidence of actual confusion may be highly probative of the likelihood of confusion." <u>Checkpoint</u>, 269 F.3d at 291.  However, "[i]f a defendant's product has been sold for an appreciable period of time without evidence of actual confusion, one can infer that continued marketing will not lead to consumer confusion in the future.  The longer the challenged product has been in use, the stronger this inference will be." <u>Versa Prods.</u>, 50 F.3d at 205.

Plaintiff has demonstrated several instances of actual confusion during Defendant's organizational period.[7]  Those instances are–Plaintiff received an inquiry from a real estate broker, who wanted to know if Plaintiff was involved in transactions that Defendant had been engaged in concerning the leasing of property in New Jersey; a banking professional inquired about employment opportunities at Plaintiff bank because he had actually heard that Defendant

---

[7] This Court accepts the Declaration of Peter Kenny, providing evidence of instances of actual confusion.  <u>See Kos Pharm.</u>, 369 F.3d at 718: "Nor do we agree with Andrx that the Berg Certification is an inadequate basis for preliminary relief because it contains multiple levels of hearsay and is not based solely on personal knowledge. It is well established that "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." <u>University of Texas v. Camenisch</u>, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). In keeping with this principle, many of our sister Circuits have recognized that "[a]ffidavits and other hearsay materials are often received in preliminary injunction proceedings." <u>Asseo v. Pan Am. Grain Co.</u>, 805 F.2d 23, 26 (1st Cir. 1986); see also <u>Ty, Inc. v. GMA Accessories, Inc.</u>, 132 F.3d 1167, 1171 (7th Cir. 1997) (citing Asseo ); <u>Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.</u>, 51 F.3d 982, 985 (11th Cir. 1995) ("At the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction...."); <u>Sierra Club, Lone Star Chapter v. FDIC</u>, 992 F.2d 545, 551 (5th Cir. 1993) (courts at preliminary injunction stage "may rely on otherwise inadmissible evidence, including hearsay"); <u>Flynt Distrib. Co. v. Harvey</u>, 734 F.2d 1389, 1394 (9th Cir. 1984) ("The urgency of obtaining a preliminary injunction ... makes it difficult to obtain affidavits from persons who would be competent to testify at trial. The trial court may even give inadmissible evidence some weight ...."); cf. <u>Heideman v. South Salt Lake City</u>, 348 F.3d 1182, 1188 (10th Cir. 2003) ("The Federal Rules of Evidence do not apply to preliminary injunction hearings.")."

was going to be opening an office in Roseland, New Jersey; an employment recruiter called the

President of Plaintiff bank to recommend a potential employee and thought she was speaking to

the President of the Defendant bank; the chairman and CEO of bank under formation inquired

about whether Plaintiff was affiliated with the Defendant; and in September 2008, an existing

client of Plaintiff informed Plaintiff's President that her father had received a solicitation package

from Defendant, and wanted to know if Defendant was affiliated with Plaintiff, as did her father.

(Kenny Decl. at ¶ 43).

"Courts are entitled to view such diverse reports of confusion as mutually reinforcing,

particularly where, as here, the names and products are so similar as to make the reported

confusion plausible." Kos Pharm, 369 F.3d at 720.  Defendant argues, however, that evidence of

actual confusion "has to be something that affects a purchasing decision" (Tr. 19:17-19:24,

November 24, 2008.)  This Court finds no support for this proposition in Third Circuit case law

nor does Defendant.  (Tr. 26:19-27:11, November 24, 2008.)[8]

---

[8] Defendant cites Pharmacia Corp. v. Alcon Labs. Inc., 201 F. Supp. 2d 335 (D.N.J. 2002) for the proposition that the "only relevant [actual] confusion in a trademark case is that which affects the purchasing and selling of goods or services in question." (Def. Mem. at 18.)   As articulated at oral argument, counsel stated that unless a plaintiff presented evidence of confusion affecting a purchasing decision, there is no "actual confusion."  (Tr. 19:17-19:24, November 24, 2008.)  This argument misreads the essence of the district court's holding.  In Pharmacia, the court found that confusion between pharmaceutical products was unlikely due to different pre-fixes, packaging, and marketing methods, as well as the products' nine-month coexistence with no actual confusion. Id.

The district court noted that in prescription drug cases, the consumers are doctors.  The evidence of actual confusion brought before the district court in Pharmacia consisted of mistakes by pharmacists who confused the products at issue.  The district court found such errors to be analogous to mistaken directory assistance, not actual confusion by customers.  The district court stated that mistakes by directory assistance are not actionable under the Lanham Act because they are not the type of confusion the Lanham Act guards against. Id. at 375.  These facts are distinct from those in the instant case and are not sufficiently analogous to be instructive.  The law in this Circuit does not require that evidence of actual confusion be dependent upon a showing that such

The Third Circuit has indicated that inquiries regarding the relationship between two companies carrying similar trademark names are indicative of actual confusion: "The District Court found that...there was some evidence of actual confusion... A&H produced an article in *Women's Wear Daily* mentioning "the introduction of the Miracle Swimsuit in the upcoming Victoria's Secret Catalog."  An A&H sales agent testified that a professional swimwear buyer asked him if A&H carried the The Miracle Bra swimsuit; that a professional swimwear representative asked if the two were related; that a former buyer asked if the Miraclesuit had that push-up element she had heard so much about; and that a buyer asked him for an appointment to see The Miracle Bra line.   A&H also presented testimony that one of its own public relations agents thought that A&H made both Miraclesuit and The Miracle Bra; that a buyer stated that she had heard of the Miraclesuit as a suit that enhanced the bust; and that an A&H receptionist had received two inquiries concerning The Miracle Bra." A&H, 237 F.3d at 226–27(citations omitted).

Despite the fact that the district court ultimately found this evidence to amount to actual confusion, but insufficient to weigh in A&H's favor, the Third Circuit noted "it is within the District Court's discretion to consider the facts, and weigh them." Id. at 227.[9]

---

confusion affected a purchasing decision.

[9] See also Kos Pharm, 369 F.3d at 720 (citations omitted), for additional examples of what constitutes actual confusion in the Third Circuit: "As Vice President of Marketing, Berg is responsible for Kos's "overall marketing strategy" and receives reports from "district managers who oversee the distribution of [Kos's] drugs ... about significant issues occurring in the marketplace." He certified that his staff has reported more than 60 incidents of actual confusion to him. He describes a range of "representative ... instances," including: medical professionals providing patients the wrong drug samples and, on one occasion, improperly filling a prescription; doctors complaining to Kos representatives about "Advicor," when their complaints really concerned Altocor; and medical professionals confusing Altocor samples with Advicor

Given the brief period of time in which Defendant has been organizing, this Court considers the multiple instances of confusion prior to the time the Defendant opened for business on November 24, 2008, to be an indicator that confusion between Plaintiff's and Defendant's mark is likely once Defendant's bank becomes even more visible to the public.  This factor weighs in favor of Plaintiff.

**Factors 7 and 8: Goods marketed through the same channels of trade and advertised through the same media; Targets of sales efforts are the same**

"Courts have recognized that 'the greater the similarity in advertising and marketing campaigns, the greater the likelihood of confusion.'  Applying this factor, courts must examine the trade exhibitions, publications and other media the parties use in marketing their products as well as the manner in which the parties use their sales forces to sell their products to consumers." Checkpoint, 269 F.3d at 288-89 (quoting Acxiom Corp. v. Axiom, Inc., 27 F. Supp. 2d 478, 502 (D. Del. 1998)).  "[W]hen parties target their sales efforts to the same consumers, there is a stronger likelihood of confusion."  Checkpoint, 269 F.3d at 289.

Defendant is planning an advertising blitz in the New York Times and Wall Street Journal, which are both major newspapers with broad appeal to potential banking customers in the New York City Metropolitan and Northern New Jersey regions, as well as around the country. (Tr. 40:15-40:17, November 24, 2008.)  Plaintiff has targeted its advertising more specifically to the Northern New Jersey area, where it is based, but the overlap between the two markets is significant because of the broad appeal of Defendant's chosen advertising forum.  See

samples, Altocor representatives with Advicor representatives, or Altocor-sponsored events with Advicor-sponsored events."

20

supra  Factor 2.

Defendant intends to open for business in New York City and its surrounding areas,
including the Northern New Jersey region, as evidenced by the fact that it owns options for office
space that it intends to use in Essex County. "Once the timing is appropriate, we plan to open an
office in Essex County, New Jersey, where we have the option on office space, and we have
hired relationship managers with connections in New Jersey." (Bagatelle Decl. at ¶ 8.)
Defendant acknowledges that it is "likely to expand into a variety of potential areas around
metropolitan New York City, including New Jersey."(Def. Mem. at 21.)  Plaintiff has
consistently identified Northern New Jersey as a target area for its business.  (Kenny Repl. Decl.
at ¶ 4.)

Plaintiff's primary focus is on commercial real estate lending, commercial loans, and
small and medium business lending much like Defendant's business.  (Kenny Decl. at ¶ 14; Tr.
30:24-31:8, November 24, 2008.)  According to Defendant, its business will focus relationships
for commercial and private banking as well as wealth management services to the owners,
principals and clients of [their] commercial clients. (Bagatelle Decl. at ¶ 6.)  Plaintiff's
"Commercial Mortgages" and "Commercial Loans" total approximately 80% of its total loan
portfolio, which is further evidence that it, like Defendant, is in the commercial banking
business.  Defendant's business will be in direct competition with Plaintiff's established and
targeted business. (Kenny Repl. Decl. at ¶ 3.)  Defendant has already secured the business of a
major sports/entertainment customer, based in Florham Park, New Jersey, thus directly
competing with Plaintiff for potential business in the Northern New Jersey region. (Plaintiff's
Repl. Br. at 14.)

This Court finds that Plaintiff and Defendant are engaged in nearly identical banking businesses. Both market their products and services to a common pool of customers in the New York metropolitan area, which includes Northern New Jersey, using similar advertising channels. Both factors 7 and 8 weigh in favor of Plaintiff.

### Factor 9: Relationship of the goods in the minds of consumers

"Under this prong, courts examine whether buyers and users of each parties' goods are likely to encounter the goods of the other, creating an assumption of common source affiliation or sponsorship. The test is whether the goods are similar enough that a customer would assume they were offered by the same source." Checkpoint, 269 F.3d at 286 (citing Fisons, 30 F.3d at 481 ("The question is whether the consumer might . . . reasonably conclude that one company would offer both of these related products.") and Wynn Oil Co. v. Thomas, 839 F.2d 1183, 1187 (6th Cir.1988)).

Plaintiff and Defendant offer virtually identical banking and other financial services to the same potential client base–businesses, wealthy individuals and small business owners. Both banks in this Court's view promote complete banking services for their respective clients. There is great potential for confusion because the parties' businesses overlap. This factor weighs in favor of Plaintiff.

**Factor 10: Other facts suggesting that the consuming public might expect the prior owner to manufacture both products, or expect the prior owner to manufacture a product in the defendant's market, or expect that the prior owner is likely to expand into the defendant's market.**

"Under this factor we look not only to evidence that a plaintiff has actually moved into the defendant's market, but also to 'other facts suggesting that the consuming public might

expect the prior owner to manufacture a product in the defendant's market, or that it is likely to expand into that market.'  Evaluating this factor, courts look to evidence that other companies sell products in both markets, as well as evidence that the products at issue are so closely related that the consuming public might find it natural for one company to do so."  Checkpoint, 269 F.3d at 290 (quoting Lapp, 721 F.2d at 463).

This factor encompasses this Court's analysis of prior Lapp factors.  Its consideration results in no substantive difference in this Court's conclusion that Defendant's mark infringes Plaintiff's mark.

### Balancing of factors

Balancing all of the factors, this Court concludes that there is likelihood of confusion between Plaintiff's mark –"Heritage Community Bank"–and Defendant's mark–"Heritage Bank, N.A.."  Weighing most heavily in favor of this conclusion is this Court's finding with respect to factors 1, 2, and 6.  Plaintiff's and Defendant's mark share a dominant term "Heritage," Plaintiff's mark is an arbitrary mark, and there are no other banks in the New York metropolitan or Northern New Jersey areas with the name "Heritage" in their title other than Plaintiff. Plaintiff has demonstrated instances of actual confusion despite the brief period in which the Defendant has been in existence as a potential entity.  Plaintiff succeeds on all of the Lapp factors.  Considering all of the factors as a whole, this Court concludes that Plaintiff is likely to succeed on the merits of this case.

### B.  Irreparable Harm to Plaintiff

"'Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of good will.'  Lack of control over one's mark 'creates the potential for damage to . . .

23

reputation[, which] constitutes irreparable injury for the purpose of granting a preliminary injunction in a trademark case.' Thus, 'trademark infringement amounts to irreparable injury as a matter of law.' '[O]nce the likelihood of confusion caused by trademark infringement has been established, the inescapable conclusion is that there was also irreparable injury.'" Kos Pharm., 369 F.3d at 726 (citations omitted).

Since this Court has concluded that there is likelihood of confusion between the marks, there likewise would be irreparable injury to Plaintiff.

### C.  Irreparable Harm to Defendant

In evaluating claims of irreparable harm, the Third Circuit has looked to facts specifically presented in connection with the potential harm.  These facts include, but are not limited to, evidence of  potential financial loss, whether the financial loss was self-imposed based on the choice of business name, and whether the defendant had any prior knowledge of the potential infringement.  See, e.g., Optician's Ass'n of America, 920 F.2d at 197; Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co., 290 F.3d 578, 596 (3d Cir. 2002).

Defendant estimates that the issuance of an injunction could cost the bank hundreds of thousands of dollars. (Def. Mem. at 26.)  Defendant, provided no argument as to any potential irreparable injury it would suffer if the request for a preliminary injunction were granted. "District courts should consider financial damages when establishing and setting the bond for an injunction, not when deciding whether to grant it." Kos Pharm, 369 F.3d at 728.  Indeed the fact that Defendant opened about a week ago speaks to the lack of any irreparable injury to Defendant.  In addition, Defendant was made aware by Plaintiff that it was potentially infringing

Plaintiff's service mark months prior to the date that it opened for business, therefore any loss incurred by Defendant is in essence self-imposed.

### D.  The Public Interest

"Public interest can be defined a number of ways, but in a trademark case, it is most often a synonym for the right of the public not to be deceived or confused."  Optician's Ass'n of America, 920 F.2d at 197.  Since this Court has concluded that there is a likelihood of confusion, and that there has already been some actual confusion, this Court finds that the public interest will be harmed if a preliminary injunction is not granted at this time.

## III.  Conclusion

After evaluating the Lapp factors, this Court concludes that there is a likelihood of confusion between Plaintiff's and Defendant's marks.  As a result, this Court finds that Plaintiff is likely to succeed on the merits of this case, and will be irreparably harmed if a preliminary injunction does not issue.  Similarly, the likelihood of confusion would result in harm to the public if a preliminary injunction does not issue.

For these reasons, Plaintiff's request for a preliminary injunction prohibiting Defendant, Heritage Bank, N.A., from using the name "Heritage" or any similar name in commerce, and ordering Defendant to retract and impound all labels, signs, prints, packages, and advertisements bearing the name "Heritage" or any variation of it will be GRANTED.


 S/Joseph A. Greenaway, Jr._____
 JOSEPH A. GREENAWAY, JR., U.S.D.J.

Dated:  December 8, 2008